STATE v. CLARDY.

1. NEW TRIAL.—There being no evidence in this case tending to show that one of the defendants convicted of manslaughter was guilty either of murder or manslaughter, it was error of law for trial Judge to refuse new trial as to him.

2. CHARGE—MANSLAUGHTER—MURDER—CRIMINAL INTENT.—Where a defendant is convicted of manslaughter for the killing of one in struggling over the possession of a pistol known by him to be loaded, without warning of that fact by him, the charge, "a criminal intent is attributed to a person who even does a grossly careless act," construed in its connections, is not error. Would such charge be error if defendant had been convicted of murder?

3. BURDEN OF PROOF—ACCIDENTAL KILLING.—CHARGE complained of did not instruct jury that burden of showing an accidental killing was on defendant, but it especially placed the burden on the State of showing every element necessary to establish a criminal homicide.

Before KLUGH, J., Laurens, July, 1905. Affirmed as to one defendant. Reversed as to the other.

Indictment against Coogler Clardy and Dick Davis for murder of Chris Herron. From sentence on verdict of manslaughter, defendants appeal.

*Messrs. Ferguson & Featherstone,* for appellant, cite: *Criminal intent must be proved:* 2 Lea., 619; 11 Rich. Eq., 489; 62 S. C., 270; 1 Bish. Crim. L., sec. 735; Clark Crim. L., 42, 43; 3 Green. on Ev., sec. 14, note 1. *Accidental killing is not an affirmative defense:* 68 S. C., 304; 24 S. E., 996.

*Solicitor R. A. Cooper* and *W. R. Richey,* contra.

February 27, 1906. The opinion of the Court was delivered by

MR. JUSTICE JONES. The defendants, indicted for the murder of Chris Herron, were convicted of manslaughter and sentenced each to seven years in the penitentiary.

On the 19th day of March, 1905, at Bethel Grove Church, in Laurens County, Chris Herron received a pistol shot wound from a pistol fired while in the hands of Coogler Clardy, from which he died about two weeks later. Coogler Clardy claimed that the shooting was done accidentally while

he and the deceased were engaged in a friendly struggle over the possession of the pistol, while Herron was trying to take the pistol from Clardy's pocket, with no intention on the part of either to fire the pistol.

The testimony for the State tended to show that in the woods near by the church a party of negroes were engaged on Sunday, the 19th day of March, 1905, in gambling with cards and drinking liquor pretty freely. The deceased, Chris Herron, and Jim Fuller were partners playing against defendants, Dick Davis and George Fuller. During the progress of the game, Dick Davis charged Jim Fuller with making a misdeal, and a dispute arose. This quieted down and they began to play again. About this time a message was sent by defendant Dick Davis to the defendant Coogler Clardy, who was some two hundred yards away at the home of Addie Henderson, some witnesses saying that the message was, "Come up here, these damn negroes are trying to run over me;" others said that the message was, "Come on and bring my liquor." Then another misdeal was charged and the game ended in a dispute between Jim Fuller and Dick Davis, in which Dick Davis attempted to strike him with a small walking stick, but Jim Fuller got out of his reach. About this time, or just previous to this, the defendant Clardy arrived on the ground with his hat off, and, as some of the witnesses testified, with his pistol in his hand; others, however, said his pistol was not in his hand when he arrived.

We take the following extracts from the testimony of the eye-witnesses. Jim Fuller testified:

"Q. What trouble did you have? A. The trouble we had, the first game we played me and Chris beat the first game, and on the next game we made four and they made one, and then Chris, the cards were dealt to him and he stood the cards and Dick came up with a misdeal, and I seed him when he slipped a card—me and Chris both seed him—and he said it was a misdeal, and I told him no such thing, and he told me it was a damn lie, it was, and then another one back. I says that is all right, Dick. I says, I won't give you no

damn lie back.  He says, by God, you need not do it.  By
that time Chris spoke and says, you all quit your foolishness.
He kept on at me to go and play.  I says, I will just quit
now.  As soon as I said that Dick, he ups and says—he
didn't call nobody's name, but says, some of you go and call
Waitus—  Q. Who is Waitus  A. I don't know what he
goes by; he stays at Gray Court.  He said to tell him to come
up there, those damn negroes were trying to run over us.
Q. Who did he send for to come?  A. Waitus.  Q. Who
went for him?  A. Waitus.  Q. Who did Waitus go for?
A. He went for Coogler for Dick Davis.  Q. Did Coogler
come?  A. Waitus went and they were so long coming Pete
Williams, he went, but after awhile, after Pete left, after
awhile Coogler come up through the woods with no hat on
his head and his pistol in his hand; he come running up there,
and when he got to where he was he wanted to know who
in the hell was trying to run over Dick Davis.  I says, no-
body, shut your mouth.  He asked me then who was that
talking to him.  I says, Jim Fuller.  He looked down on
me then and says, is that you, Jim?  I says, yes.  He says,
well, by God, I wouldn't hurt a hair on your head.  Then he
asked Dick again who in the hell was trying to run over him.
Chris says, Coot, quit so much of your foolishness, and Coot
asked him what in the hell did he have to do with it, and
he told him nothing, nothing, and he told him that, and he
just walked up to him and shoved him back and he shoved
Chris back, and Chris told him, don't be shoving me that
way, and before he could get straight he run his hand in his
pocket and jerked out his pistol and shot him.  Q. What
was Chris doing, nothing?  A. Nothing.  *  *  *  Q.
What did Coogler do after he shot him?  A. When Coogler
shot him Chris slapped one hand right here and the other
one here (indicating), and says, Coogler, you have shot me,
and you know I never did bother nobody, and he walked off
a little piece and went to get down, and Coot threw his arms
around Chris's neck and says, I wouldn't have done this for
nothing.  I says, Coot, what did you shoot Chris for?  He

says, I don't know, Jim; I don't know what I shot him for.
Q. Where had Coogler been after the shooting before he
came back and said to Chris, I wouldn't have done this for
anything? A. He had not been anywhere. Q. Had he
walked about any at all? A. No, sir; he had not. Q. Did
Coogler say anything to you after the shooting that day?
A. No, sir; Coogler didn't; Dick did. Q. What did Dick
say? A. After the shooting had taken place Coot and Dick
went on out through the woods. They were gone about five
minutes, as near as I can come at it, and come back together
and told me to come there. They come as near to Chris as
you is to me and told me to come there. I asked them what
they wanted. He says, come here. The money me and
Chris had won from Dick he had taken it, and he offered
me the money back, and I told him I didn't want it, and he
put it in my pocket and says, Jim, here, I will give you a
dollar to stick to me and Coot, and I told him I didn't want
no money, and turned round and walked off, and while I was
standing there Coot's pistol dropped out of his pants on the
ground, and Dick picked the pistol up and said, Come on,
let's go; and they put off back down towards the church.
Q. Dick and Coot? A. Yes, sir. Q. What did Dick Davis
have in his hand that day? A. A stick. Q. What did he
try to do with the stick, if anything? A. He drawed it on
me twice. Q. What did he say when he drew it on you?
A. He was cursing me and daring me to curse him back.
Q. After Coogler had shot Chris Herron what did Dick
say to you? A. After he had shot Chris, when Chris went
and lied down and Coot went with him, he went and cotch
hold to Coot and told him to come on; let the damn son of
a bitch go. Then after he done that he went up in the woods
and come back and spoke what I said."

Pete Williams testified: "Q. Were you a looker-on? A.
Yes, sir. Q. You were taking no part in the game? A.
No, sir. Q. Did you hear any fuss between them? A. Yes,
sir. Q. Tell us about it. A. Well, they were gambling,
and as far as I heard they gambled a while, and Dick Davis

rose up with a stick and 'lowed to Jim, 'God damn your soul, you have been making a misdeal; if you don't play me square I am going to get up and quit.' Q. Who said that? A. Dick Davis to Jim Fuller. So they set back down and went to gambling on, and Dick Davis called this here Waitus Morris and was talking to him and Waitus went down to Addie Henderson's and stayed a long while, and he says to me, Pete, you go to tell Coogler to come on and bring my liquor, and I will give you some of it. I went on down there and met them out down the path, and come on back with them. Q. Who did you meet in the path? A. This here Waitus Morris and Coogler Clardy. I come on back with them and got mighty near there and they stopped and went to talking, and I seed Coogler go in his inside pocket and put a bottle of liquor in there, and take his pistol out and hold it on his side, and went up to the crowd and said, Who in hell is that after Dick Davis? They said, Nobody; go ahead on about your business. Q. Who said that? A. Jim Fuller. And then the row sort of started, and about that time Coogler stepped off and Dick Davis jumped off and said, 'You God damn son of a bitch, you been making a misdeal; if you don't give me my money back I will beat hell out of you,' and they got to going around a tree, Dick after him with a stick. Q. Who was he after? A. Jim Fuller. And Coogler walked back up there and says, 'Jim, you are in the wrong,' and Chris got up and said, 'You are in the wrong,' and pushed him back, and Coogler says, 'God damn your soul, don't fool with me,' and pulled his pistol and shot him. And Dick Davis says, 'Yes, that is the way to plug it to a God damn son of a bitch,' and Jim got scared and handed up the money, and Coogler said, Chris, I wouldn't have shot you for nothing; and he looked like he was going to die. Q. What was Chris doing when Coogler shot him? A. Nothing."

Allen Parks testified: "Q. Were you playing? A. No, sir, I wasn't playing. Q. You and Pete Williams were looking on? A. Yes, sir. Q. Tell us what took place dur-

ing that game? A. Well, they were playing, and they all got up a dispute about something. Q. What was the dispute about? A. In the game, something about a misdeal; that is, Dick and Jim Fuller. Dick, he sends up for Coogler to come up there. Q. Who did he send? A. Waitus. Q. Waitus Morris? A. I don't know, sir; Waitus, all I know is Waitus. Q. He sent after who? A. Coogler. Q. What did he tell Waitus to tell Coogler? A. To tell Coogler to come up there, the negroes were trying to run over him. Q. What negroes were trying to run over him? A. The Henderson negroes. Coogler come up there. Q. Before Coogler came what did Pete Williams do? A. Pete was still there. Dick told Pete to go down there to tell Coogler to come on up there and bring his liquor, he wanted a dram. Q. How long after Pete left was it before Coogler came? A. About ten minutes, I reckon. Q. When Coogler came what did he have? A. He come up there and asked what in the hell was the matter with Dick? Q. What did he have? A. He had his pistol. Q. Where was his pistol? A. He had it in his hand sort of this way (indicating). They said there wasn't nothing to matter. Q. Who said there wasn't nothing to matter? A. Jim Fuller, I think it was. Q. Go on. A. And they kept disputing along and disputing and he shot him. That is all I know. Q. Did you see Coogler Clardy when he was hugging and kissing Jim Fuller? A. I seed him when he come up, I never seed the kiss. Q. What did Jim Fuller say to Coogler when he came up? A. Told Coogler there wasn't nothing the matter. Q. Then what did Coogler say to him? A. He said, Well, that is all right. Q. What did Chris say? A. Chris wasn't saying nothing, only telling them to be quiet, boys. Q. Is that all he said? A. That is all Chris was saying. Q. Is that all he did? A. After they all got up, Chris said, "There wasn't any use of you all trying to run over Jim.' Q. Who was trying to run over Jim? A. Nobody. Q. What was Dick Davis doing? A. He had a stick drawn on Jim. Q. What was Dick Davis saying? A. He told Jim he had been cuss-

ing all day, and he was tired of it. Q. What did Chris Herron say? A. He wasn't saying anything. Q. What did he do? A. He didn't do anything. Q. Did he walk up to where they were? A. He was already there, and after they all begun to shove on Jim, he walked up and says, 'Boys, be quiet.' Coogler pushed him back and shot him. Q. Where did Coogler get his pistol? A. Out of his fore pants pocket. Q. What was Chris doing to Coogler when he shot him? A. Nothing. Q. What did he have in his hand? A. Nothing. Q. After Chris was shot what did he do? A. He turned round and said, 'Lord, you have shot me.' Coogler said, 'I did shoot you. I wouldn't have shot you for nothing,' and he asked him if he wanted him to carry him home. Q. Did you have any talk with Dick and Coogler after they came back? A. After Chris was carried home I was. Q. What did they say to you? A. They were telling something about how to tell it. I forget how they said now. Q. Something about how to tell what? A. The shooting. Q. How did they tell you how to tell it? A. To tell I didn't know who done the shooting. Q. Coogler and Dick Davis told you to tell that? A. Yes, sir. Q. Where was that? A. Pretty close where it was done. Q. Did they offer you anything? A. They didn't offer me anything. They offered Jim Fuller a dollar. Q. Who offered him a dollar? A. Dick. Q. In your presence? A. Yes, sir. Q. Did he take it? A. No, sir. Q. What did they offer him a dollar for? A. To tell he didn't know who done the shooting. Q. Did he agree to do it? A. No, sir. Q. Did they offer you the same thing? A. Yes, sir. Q. Did you agree to do it? A. No, sir."

Henry Abercrombie testified: "Q. Did you see the difficulty between Chris Herron and Coogler Clardy? A. I did Q. Tell us what it commenced about and everything about it? A. Just as I walked up they were playing a game, and there was a misdeal, and Dick Davis says, there is another misdeal; and Jim Fuller spoke and says, 'If it is, your damn partner made;' and Dick says, 'Jim, you have been cussing

me all day, don't cuss me no more;' and Jim says, 'What is the matter, Dick;' and George says, 'Yes, I meant it go on back.' And that time they raised up and Dick Davis had a stick in his hand and made two licks towards Jim. Coogler and Allen Parks and Jim Wharton were standing off, and Coogler come up and says, 'Who in the hell is trying to run over Dick?' Jim Fuller says, 'Nobody;' and he spoke that again and he says, 'Who is this talking to me?' Jim says, 'It is me.' He looked up at him and says, 'Is that you? I wouldn't hurt a hair in your head.' He turned around then and says, 'Chris, who is that trying to run over Dick Davis?' Chris says, 'Nobody,' and he spoke the word again, and Chris pushed him back and says, 'Get back, Coogler, damn Dick, quit your foolishness,' and about that time he fired. Q. You were not there when Dick Davis sent Waitus for Coogler? A. No, sir. Q. You came up how long before Waitus and Coogler came up? A. I wasn't there when they came up. Q. Was Coogler there when you went up? A. Yes, sir, standing off a piece talking. Q. You came up after the row had started? A. Just in time of it. Q. Now, you say Dick Davis had his stick drawn on who? A. Jim Fuller. Q. And what did Jim say? A. He didn't say anything. He asked him what is the matter? Dick spoke and says, 'You have been cussing me all day; don't cuss me no more;' Jim pushed on back. Q. What did Chris Herron do? A. He wasn't doing a thing as I could see. He was looking at them. Q. What did he do to Chris that caused him to shoot him? A. Just pushed him. Q. Why did he push him? A. Coogler asked him who in the hell was trying to run over Dick, and Chris s⁓⁓. 'Oh, damn Dick, go on and quit your foolishness.' Q. Then what did Coogler do? A. Just shot him. Q. Did he fall? A. No, sir; he just squatted down and said, 'Coogler, you shot me.' He says, 'No, I didn't; if I did I didn't mean to do it.' Coogler says, 'You want me to carry you home? If I shot you I didn't mean to do it; I wouldn't do it for nothing in the world.' Coogler says, 'I will carry you home.' That time I was passing by

Chris and Chris looked and seed me and says, Henry, come back and carry me home, don't leave me. And I come back to where he was at, and Coogler had his arms around him and says, 'You know I am with you, Chris.' And Chris says, 'Yes, you are too late; you have shot me.' "

For the defense, Jim Wharton testified: "Q. How did it happen? A. I don't know, sir, when I seed it they were all in a huddle. Q. Who was in a huddle? A. Chris and Coot and all of them. Q. Did you hear any threats or fuss there? A. Never heard a bit. Q. Was anybody mad? A. No, sir; they didn't seem to be. Q. Who was together in the scuffle when the pistol went off? A. They were all so packed up together I couldn't tell. Q. Could you tell that Coogler and Chris were there? A. Yes, sir; I know they were there. Q. Did they have hold of each other or not? A. I couldn't tell."

This witness testified that he did not see Dick Davis do anything, only when the misdeal came up Dick cursed and Jim cursed too, that Jim picked up the stick, but he did not see him strike anybody with it.

Waitus Morris testified: "Q. Jim Fuller and these boys say that Dick Davis sent you down there for Coogler to come up there, those boys were running over him? A. He couldn't send me when I had not been there? Q. Did any such thing happen? A. I had not been there until Pete come for Coot for Dick's liquor. Q. How did you happen to go up there? A. Coogler asked me to come walk up there with him. Q. You went up there together? A. Yes, sir. Q. Did you have any liquor? A. I had a half pint that belonged to Chris. Q. When did you give it to Chris? A. I didn't give it to him. Q. When you and Coogler walked up there what did Coogler have in his hand? A. Nothing. Q. He didn't have a pistol? A. No, sir; not a thing in his hand. Q. What happened after you got up there? A. When I got up there they begun to try to bring up—there was a little row, I suppose, before I got there. Q. Tell what happened? A. Coot and Chris and all of them

got to squabbling, and they run in there together squabbling and hugging up, and the pistol fired. Q. Did you see anybody mad? A. If they did, I couldn't tell it. Q. You could tell whether they were in a good humor or mad, couldn't you? A. It looked to me like everything was going on lovely. Q. Who had hold of each other when the pistol went off? A. I couldn't tell. Q. Could you see Coogler and Chris there? A. Yes, sir; they were there. Q. They were there together? A. Yes, sir. Q. It has been testified that Dick Davis was cutting up and snorting around? A. Dick and Jim Fuller were quarreling a little. Q. Did Dick try to hit anybody? A. Dick had a stick. Q. Did he try to hit anybody? A. Not as I know of. I didn't pay much attention to it. Q. Jim and Allen and these boys say that Coogler came up there bareheaded, and wanted to know who in the hell was trying to run over Dick Davis? A. If he said that I didn't hear him. Q. You were there? A. Yes, sir. Q. And after that they sort of quieted down, and then Chris Herron said something and sort of pushed at Coot, and Coot pushed him back and drew his pistol and shot him? A. Coot and Chris were pushing when I seen them, and the boys gathering around them. Q. Did they have hold of each other or not? A. It appeared to me like they did, but the whole entire thing was drunk so a man couldn't tell how it was."

George Fuller testified: "Q. It has been testified by Jim Fuller and a lot of these negroes that Dick got into a row and Dick sent Waitus Morris to tell Coot to come up quick, the boys were trying to run over him. A. If he did I didn't hear him say it. Q. You were playing partner with who? A. Old man Dick. Q. When was the first time you saw Waitus? A. We met in the road, and Chris sent him off to get a half pint of liquor. Q. When did Waitus get to where you all were? A. He come up with Coogler. Q. What did Coogler have in his hand? A. I didn't see anything at all. Q. What happened then? A. Nothing, only old man Jim and Dick were sort of cussing one another. Q.

What did Dick do? A. He didn't do anything, only told Jim he had been cussing him all day, and jumped up and got his stick. Q. After that? A. They were all standing up in a huddle. Q. Did they stay mad or not? A. No, sir; they didn't look like to me they were mad. Q. Did you see the shooting? A. No, sir; I had my back to them. Q. How were Coogler and Chris Herron standing; what were they doing when the pistol shot? A. They wasn't doing anything as I knows of. Q. How close were they together? A. When I turned around and looked to see who shot, Coogler had caught around Chris to help him up. Q. This is the first you saw of it? A. Yes, sir. Q. You didn't see the actual shooting? A. No, sir. Q. Do you know anything else about this thing? A. No, sir; not nothing much. Q. What did Chris say when he was shot and what did Coogler say? A. Chris said, 'Oh, Lord, I am shot,' and Coogler says, 'Chris, I wouldn't have shot you for nothing; I will carry you home and go and get a doctor for you; you know I am with you.' Chris says, 'I know you is, but it is too late now, I am shot.' "

The defendant Coogler Clardy testified: "Q. How did you happen to go up there? A. Pete come down where me and Waitus was and said Uncle Dick said come up there and bring his liquor. Q. Tell those gentlemen what happened when you got there? A. When I got there they had been playing, and they were arguing, and Jim and Uncle Dick— Q. Doing what? A. Arguing. They stopped talking to each other. I says, Dick, what you want? and Dick says, I want my liquor, give me a drink. And I stood there and asked Jim what was the matter, and Jim says nothing, and I looked and says, 'Who is this; you, Jim?' Jim says, 'Yes.' Me and him hugged and kissed and I says to Jim Wharton, 'Come here,' and me and Jim walked off a piece and I told him to get some liquor, I was going home. Jim said he didn't want any, to give Allen Parks his. About that time they were talking again and Allen Parks come up and got a drink, and Jim Fuller and Uncle Dick

got to talking again, and Uncle Dick had a stick in his hand, and Jim Fuller was going backwards with his hand in his hip pocket, telling Dick not to get up on him, and Jim went backwards the distance from here to the door. Q. What did Dick have in his hand? A. A little walking stick, and I went to Jim and begged him not to have no fuss. if he couldn't play without fussing I would quit, and Jim said he would and turned and went off. I went back and says, Chris, what is the matter, and Chris says, 'Nothing, Uncle Dick is going on; give me a drink of liquor.' I give him a drink and took one myself, and that time me and Chris got to scuffling. Q. Were you mad? A. No, sir. My pistol was in my right coat pocket with the barrel up. Chris reached and got it, and time he got it I got it, and we reached and were pulling over it and it went off. Q. What part of the pistol did you have hold of when it went off? A. I had hold of the handle. Q. Did you pull the trigger or not? A. I don't know, sir, how it went off; I was drinking. Q. You were scuffling? A. Yes, sir. Q. What kind of a pistol was it? A. A 32. Q. What kind of action? A. A self-acting. Q. Where did you have your pistol when you went up there? A. In my coat pocket. Q. What happened immediately after the shooting? A. Nothing, only Chris started to lay down; he laid back on one hand and I picked him up. He says, 'Lord, I am shot,' and I says, 'You know I wouldn't have shot you for nothing in the world,' and he says, 'No, but it is too late, I am shot.' And I picked him up and asked him did he want me to carry him home. Q. Where did you go then? A. I stayed there awhile and talked with him. Q. Then where did you go? A. To the road where I had left from."

Defendant Dick Davis testified: "Q. Tell those gentlemen what happened? A. We go up there and set down to take a game of cards, and I said to the boys, 'Let's play for a quarter,' and they said, 'No, not for but ten cents.' I said, 'If I had knowed that, I wouldn't have come up here fooling with you.' So we set down and went to playing. We

played on, and directly a misdeal come up. Jim made that misdeal; the first one made; well, we got that settled and set in again, and I says to him, 'Now here come up another damn misdeal,' after we played the hand nearly out. Jim commenced cussing again—he had been cussing all the morning—and I says, 'I want you to quit cussing me. I haven't done anything to you,' and he cussed on and after this misdeal we didn't play any more. We gets up then and stands there talking about it. I got a little light black walking cane. I bought it from the store, and I picked up the stick and says, 'Jim, you been cussing me all day and I am tired of it; don't cuss me any more.' Jim walked backwards from me— Q. What was Jim doing at that time? A. Jim walked backwards a few seconds and put his hand under his coat and says, he wasn't afraid of me. I says, 'I ain't no bear, either a panther.' He walked back and cussed me, walked back around a bush and went off. Coogler come up — Q. Before that? A. Who sent for Coogler? Q. Who did you send? A. Pete Williams. Q. What for? A. For my whiskey. Q. Did you tell Pete to tell him that? A. Yes, sir; to come up there and fetch my whiskey and I would give him a drink, and directly Pete got back and he never got his whiskey. Q. Did you draw your stick? A. No, sir; I just had it in my hand. Q. What did you do with it? A. Carried it home. Q. Did you hit anybody that day? A. No, sir, never hit nobody. Q. When Coogler came up who came with him? A. Waitus Morris and Pete Williams. Q. What happened then? A. They came up there. They were playing and Coogler asked them, 'What are you boys fussing about?' Jim said, 'Nothing.' Chris is the man that said, 'Nothing, there ain't nobody fussing; you know me and Dick never do fuss.' Coogler walks around here by Jim and says to Jim, 'Who is this?' Jim says, 'It is me.' He got down and hugged and kissed Jim, and Jim says, 'Me and you are kin.' He got up and him and Jim Wharton walked off a piece and Allen Parks, and when they come back, when I saw them I was still talking to Jim and I

saw Chris and Coogler together. Q. What were they doing? A. It semed like they were pushing and pulling over one another. Q. What happened then? A. I turned around, still talking to Jim, and just as I turned around the pistol fired. Q. Did Chris and Coogler have hold of each other when the pistor fired? A. Yes, sir."

Both defendants denied that they had offered anybody any money to swear that Coogler didn't do the shooting, as testified by two witnesses for the State.

Having thus set out in detail the material testimony of the eye-witnesses, we proceed to consider, first, the question raised in behalf of appellant Dick Davis, whether the Circuit Court committed error in refusing his motion for a new trial, made on the ground that there was absolutely no testimony upon which to convict him of manslaughter. When there is no testimony upon which to base a verdict, it is error of law to refuse a new trial. A careful examination of the testimony satisfies us there was no testimony to convict Dick Davis of murder or manslaughter, and that he should have a new trial. He certainly did not assault or strike the deceased, and there was no evidence that he was present aiding or abetting Clardy in his struggle with deceased. His controversy was with another party, Jim Fuller. a relative and friend of his co-defendant, and there is nothing to show concert of action between him and Clardy against Herron and Fuller. However reprehensible in other respects his conduct may have been, before and after the homicide, it will not serve society or vindicate the law to convict him of an offense which he did not commit.

The remaining exceptions relate to the following charge to the jury: "It is incumbent upon the State to prove beyond all reasonable doubt, not only that the defendant killed the deceased, but that he did it intentionally, with a criminal intent, before you can find that he is guilty with reference to the killing. Now, that criminal intent usually leads a person intentionally or voluntarily to do the act complained of, and a criminal intent is attributed to a person who even

does a grossly careless act; the law presumes that he intended to do what he actually did do, and if he did an act that was grossly careless, and therefore unlawful, the law imputes the unlawfulness of his gross carelessness to the result of it, and also imputes the intent to be grossly careless, and therefore, to act unlawfully, and so make the criminal intent, which is necessary to make out a case of guilty of crime in any case."

It is contended that these instructions were erroneous:

"(1) In charging the jury that the law implies a criminal intent from the performance of a grossly careless act—instead of submitting to the jury the question as to whether or not there was a criminal intent.

"(2) In charging the jury that he intended to do what he actually did do—when it is respectfully submitted that the intent with which the defendants did the act was the identical question at issue, and which question should have been passed upon by the jury.

"(3) In charging the jury that if the defendants did an act that was grossly careless, and therefore unlawful, the law imputes the unlawfulness of their gross carelessness to the result of it—which it is respectfully submitted was, in effect, a charge upon the facts, and was, in effect, telling the jury that the law imputes an unlawful killing from the mere fact of the killing.

"(4) In charging the jury that the law imputes the intention to be grossly careless—when such question should have been submitted to the jury for determination.

"(5) In charging the jury that the law presumes a criminal intent, or that there is any presumption arising from the killing, when all the facts and circumstances are brought out.

"(6) That the charge put the burden of proof that the killing was accidental upon the defendant, whereas the burden was upon the State.

"(7) That the charge was inapplicable in a case where the defense was accidental killing."

At first blush, this appears to be a formidable attack upon the above instructions to the jury, but a careful consideration will, we think, show that the exceptions should not be sustained. In the first place, it must be remembered that the defendants were convicted of manslaughter and that, therefore, it is not material to inquire whether the charge may have been erroneous, misleading or confusing as applied to the question of malice, an essential element of murder as distinguished from criminal intent, an essential element of all crimes at common law. There being no conviction for murder, all questions touching malice go out of the case. This observation relates especially to that portion of the above charge which states that the law in a case of homicide by gross carelessness "imputes the intention to be grossly careless." Inasmuch as an intention to be grossly careless indicates active wantonness and wilfulness, which may be construed as malice, there would have been more ground for criticism of the charge, if the verdict had been for murder. In the case of homicide by gross carelessness in the handling of a deadly weapon, the verdict should be either murder or manslaughter, according as the jury may determine the presence or absence of malice. But as stated, the verdict being for manslaughter, we are only to inquire whether the charge was incorrect with respect to manslaughter. We would remark next that it must be borne in mind that the undisputed fact was that the deceased came to his death from a wound inflicted with a deadly weapon, a loaded pistol, in the hand of the defendant Clardy, and it was not contended by defendant that it was done lawfully in self-defense or otherwise, but that it was accidental. The case of *State* vs. *Morgan*, 40 S. C., 346, 18 S. E., 937, holds: "Where one seeks to be excused for taking the life of another with a deadly weapon on the ground of accident, it must appear that due care was exercised in handling such weapon." It is true, as contended by appellant, that accidental killing is not an affirmative defense, but that the burden is on the State to show an intentional killing.

*State* vs. *McDaniel,* 68 S. C., 304, 47 S. E., 384. But the Court nowhere in the charge placed the burden to show an accidental killing on the defendant. The charge throughout squarely and explicitly placed the burden upon the State to prove every element necessary to show a criminal homicide. In the particular portion of the charge complained of the Court had no reference to the burden of proof to show an accidental killing, but was endeavoring to state the law touching homicide with a deadly weapon through gross carelessness. To show how carefully the Court guarded the rights of the appellant, we quote from the charge:

"Unless it appears to your satisfaction beyond all reasonable doubt that there was a criminal intent on the part of these parties or whichever one of them did the act, if either of them did it, then you cannot find that it was an intentional act, and therefore you must attribute it to the doctrine of accidental killing and find a verdict of not guilty."

"It is incumbent upon the State to prove beyond all reasonable doubt not only that the defendant killed the deceased, but that he did it intentionally with a criminal intent, before you can find that he is guilty with reference to the killing."

"So, if you have any reasonable doubt as to whether it was an accidental killing or not, find that it was an accidental killing and acquit them. If you are satisfied beyond all reasonable doubt that it was not an accidental killing and you should conclude that they are guilty of either murder or manslaughter, and have a reasonable doubt as to which, find manslaughter rather than murder."

Finally, in response to appellant's request, the last words given to the jury were the following: " 'If the jury believe from the evidence that Coogler Clardy had a pistol in his pocket, and that Chris Herron undertook to take the pistol away from him, and in a good-natured way they scuffled over the pistol, and in the scuffle the pistol went off, without either party intending it to go off, then I charge you that the

defendant Coogler Clardy should be acquitted.' I so charge you."

From the foregoing extracts, it is manifest that the appellant could not claim that the plea of accidental killing was not with great fairness submitted to the jury and that the burden of proof was not properly placed upon the State throughout.

The verdict of the jury under these instructions establishes the fact that the killing was not accidental.

2    With the foregoing facts and principles in view, we now examine whether the charge was harmfully erroneous with reference to the crime of manslaughter.

The Court charged that "a criminal intent is attributed to a person who even does a grossly careless act," which, in the light of undisputed facts, meant, that "a criminal intent is attributed to a person who kills another with a deadly weapon from gross carelessness," but the jury were left to determine whether such act was done with gross carelessness. So the language of the charge, "the law presumes that he intended to do what he actually did do," in the light of the facts, simply means, "the law, in the case of a homicide with a deadly weapon under circumstances showing gross carelessness, presumes that he intended to do what he actually did do." In like manner, and eliminating the question of malice and murder, we must view the other expressions in the charge. The Circuit Judge, recognizing the rule that there must be a criminal intent for every common law crime, and having previously clearly stated the law concerning murder and voluntary manslaughter, was submitting to the jury the law as to voluntary manslaughter, in which gross negligence supplies the place of criminal intent. In such a case, it is not material whether we say the law "attributes" or "presumes" or "imputes" or "infers" or merely "supplies" the necessary criminal intent from gross carelessness. No one can be permitted to say that he committed a homicide with a deadly weapon accidentally, if it appears that it was the result of

his gross carelessness.   *State* vs. *Morgan,* 40 S. C., 347, 18
S. E., 937.

In 90 Am. St. Rep., 571-581, there is an able and elabo-
rate annotation on the subject of "Unintentional homicide in
the commission of an unlawful act," where the cases are col-
lected.    The learned annotator defines involuntary man-
slaughter as "the unlawful killing of a human being without
malice either express or implied, and without intent to kill
or inflict an injury causing death, committed accidentally in
the commission of some unlawful act not felonious or in the
improper or negligent performance of an act lawful in it-
self."   That author further says, "This definition includes
homicides resulting from negligent performance, without
actual criminal intent, of a lawful act.   And undoubtedly
the common law rule is that criminality may be affirmed of
a lawful act carelessly or negligently done.   The negligence,
however, must be aggravated, culpable, gross.   That is, it
must be such a departure from what would be the conduct of
an ordinarily prudent or careful man under the same circum-
stances as evidences a disregard of human life or indif-
ference to consequences.   The negligence in such cases sup-
plies in a measure the direct criminal intent."   In Bishop's
Crim. Law, 6th ed., par. 313, the author says, "There is little
distinction, except in degree, between a positive will to do
wrong and an indifference whether wrong is done or not.
Therefore, carelessness is criminal, and within limits sup-
plies the place of the direct criminal intent.   Thus—homi-
cide from carelessness—every act of gross negligence, even
in the performance of what is lawful and *a priori* of what is
not lawful, and every negligent commission of a legal duty
whereby death ensues, is indictable either as murder or man-
slaughter."

In note 3, L. R. A., 645, cases are cited to the effect that
gross carelessness is criminal, even if the act done is lawful,
and that such negligence supplies the place of criminal in-
tent.   See Clark's Crim. Law, par. 76 ; Wharton Crim. Law,
8th ed., par. 125 ; Roscoe's Crim. Ev., 670 ; Archbold's Crim.

Pr. & Pl., 655; *State* vs. *Vines,* 93 N. C., 493; 53 Am. Rep., 466; *State* vs. *Emery,* 78 Mo., 77, 47 Am. Rep., 92; *State* vs. *Dorsey,* 118 Ind., 167, 10 Am. St. Rep., 111; *State* vs. *Austin,* 110 Ga., 748, 78 Am. St. Rep., 134. These authorities and others that might be cited show that gross carelessness in the handling of firearms which results in killing a human being is at least manslaughter.

Even if the defendant Clardy's narrative of the circumstances might have been accepted as true, although there is little support therefor beyond his own statement, still the verdict as to Clardy should not be disturbed on any extremely technical or hypercritical view of the charge. In the light of the authorities above cited, we hold it substantially correct as applied to the facts of this case.

In view of the many shocking deaths resulting from the reckless handling of firearms, we think it would be highly dangerous to say that struggling over possession of a loaded pistol in a crowd is a lawful sport or recreation, but even if we should go so far as to say that defendant was lawfully engaged in a friendly struggle with the deceased over the pistol, still there was good ground for the jury to hold him grossly negligent. The defendant knew the pistol was loaded and he had hold of the handle, and yet there is no evidence that he warned or informed the deceased of this fact, or that he exercised any care to avoid the unfortunate result.

The judgment of this Court is, that with respect to defendant Dick Davis the judgment of the Circuit Court is reversed and the case remanded for a new trial, but that with respect to the defendant Coogler Clardy the judgment of the Circuit Court is affirmed.